IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ELISA S. GALLO, MD,

      Plaintiff,

 v.

MAYO CLINIC HEALTH SYSTEM-
FRANCISCAN MEDICAL CENTER, INC. and
MICHAEL WHITE, MD,

      Defendants.

OPINION & ORDER

15-cv-304-jdp

---

 Plaintiff Elisa S. Gallo brings this case against her former employer, Mayo Clinic Health System—Franciscan Medical Center, Inc., and her supervisor there, Michael White. Gallo contends that defendants breached her separation agreement, which prohibited defendants from making unfavorable comments in response to requests for references from prospective employers. Gallo contends that she lost a job at another clinic after White rated aspects of Gallo's performance "fair." The "fair" ratings, according to Gallo, were unfavorable references that breached the separation agreement.

 Three motions are before the court: (1) defendants' motion to enforce a settlement agreement, Dkt. 65; (2) defendants' motion for summary judgment, Dkt. 39; and (3) Gallo's motion to strike the declaration of Corinna Manini, Dkt. 56.

 I will deny the motion to enforce the settlement because Wisconsin law requires that settlement agreements be in writing. I will deny Gallo's motion to strike because the failure to get Manini's deposition is due primarily to Gallo's lack of diligence. I will grant defendants' motion for summary judgment. White gave the "fair" ratings in response to a credentialing evaluation, a request that was not specifically addressed in the separation

agreement, and I conclude that White's ratings did not breach the separation agreement. I also conclude that Gallo has not adduced admissible evidence to show that defendants' conduct caused her to lose the new job.

UNDISPUTED FACTS

The following facts are not genuinely disputed except where noted.

Gallo is a dermatologist who worked at a Mayo Clinic facility in LaCrosse, Wisconsin, starting in February 2010. (I'll refer to this entity simply as Mayo Clinic.) White is the chairman of the dermatology department at Mayo Clinic and Gallo's former supervisor.

**A. Gallo's resignation from Mayo Clinic and the Separation Agreement**

In September 2010, White met with Gallo to discuss performance issues. White outlined corrective steps that Gallo would have to take to continue her employment. But Gallo did not take those steps, and Mayo Clinic placed Gallo on unpaid leave. Gallo then resigned from her position and entered a written Separation Agreement with Mayo Clinic.

The Separation Agreement contained a provision that specified how Mayo Clinic would respond to reference requests from prospective employers. That provision, Section 1.B of the Separation Agreement, states the following:

> The parties have agreed upon a letter of reference for Employee to be provided to potential employers seeking a reference. The letter of reference is attached hereto as Exhibit A and incorporated herein. Employer will provide a signed original letter of reference on company letterhead not marked as an exhibit within two business days this Agreement is signed by Employee. In the event Employer receives any requests for a verbal reference for Employee, all such requests shall be directed to Barbara Saathoff [in-house counsel at Mayo Clinic], who will respond to the inquiry pursuant to normal procedural protocol relevant to Employee's dates of employment and position. Employer will state nothing that will be inconsistent with the

>letter of reference (Exhibit A) attached hereto. No reference will be made to any performance issue and nothing derogatory will be stated. Employer agrees that it will expunge all references to any disciplinary or performance concern relevant to Employee. If asked why Dr. Gallo has left its employ, Employer will state only that due to the dire medical situation with her grandmother that Dr. Gallo desires to relocate to Chicago. Nothing will be stated or inferred that Dr. Gallo is not eligible for re-employment at any time.

Dkt. 1-1, at 1-2.

### B. Gallo's employment application at Refuah Health Center

In June 2013, Gallo applied for a dermatologist position at Refuah Health Center in New York City. Refuah extended Gallo an offer of employment in August 2013, but Refuah eventually declined to hire Gallo. Most of the important facts surrounding the Refuah episode are undisputed, but the parties draw different conclusions about why Refuah did not hire Gallo. Defendants contend that Refuah rescinded its offer because Gallo prolonged the negotiation by pressing for unreasonable terms and that Refuah decided to fill its staffing needs with a dermatologist who was already working at Refuah. Dkt. 45, at 8. But Gallo contends that Refuah did not hire her because White gave her fair ratings in response to a request for information from Mount Sinai Hospital, which had a relationship with Refuah.

Here are the facts. Refuah extended a first job offer to Gallo in August 2013. From August to September 2013, Gallo negotiated various terms of her employment contract with Corinna Manini, the director of Medical Services at Refuah. While the negotiation went on, Manini wrote an email to one of her colleagues stating, "I can't stand Gallo." Dkt. 44-5. Refuah rescinded its offer a few days later, September 18, 2013, and filled the position with a dermatologist who had already been working at Refuah. About a month later, Gallo wrote to Manini and explained that she would "accept whatever [Refuah]" had to offer. Dkt. 44-6; *see*

3

*also* Dkt. 75, ¶ 62. Between mid-October to December 2013, Gallo and Manini discussed the prospect of Refuah hiring Gallo for another position at Refuah, and in December 2013, Refuah extended an offer to Gallo for that position. For the next few months, Gallo worked on getting licensed to practice medicine in New York, and Refuah extended another offer in April 2014. Gallo then began further negotiation of the terms of her employment. On April 30, 2014, Manini wrote to Mark Lebwohl, a dermatologist at Mount Sinai Hospital who had referred Gallo to Refuah, that "Gallo is driving us nuts." Dkt. 44-8. On May 6, 2014, Gallo wrote an email raising 18 additional issues concerning her employment contract. 44-9, at 1-2. The same day, Manini wrote another internal email, stating, "I am happy to rescind the offer." Dkt. 44-10. Manini also told Lebwohl that Gallo was "very unreasonable" and "questioned whether Gallo was the right person for the job." Dkt. 75, ¶ 117.

Gallo tells another part of the story. Mount Sinai Hospital—where Lebwohl was chair of dermatology—regularly sends its residents to Refuah, and doctors at Refuah often supervise residents from Mount Sinai. Because of this relationship, Refuah doctors who might supervise Mount Sinai residents need to be, in hospital parlance, "credentialed" by Mount Sinai before starting employment at Refuah. As part of its credentialing process, Mount Sinai sends credential forms to the prospective doctor's former supervisors, asking the former supervisors to rate the candidate from "poor" to "superior" in 13 categories. In Gallo's case, Mount Sinai sent a credential form to White, and White—after seeking advice from Barbara Saathoff, in-house counsel at Mayo Clinic—completed the form. Dkt. 75, ¶¶ 83-86. For 11 out of the 13 categories, White rated Gallo "superior" or "good." Dkt. 75, ¶¶ 90-91. But White rated Gallo "fair" on the two remaining categories: (1) accepting feedback; and (2) ability to work with others. Dkt. 43, ¶ 41. White gave those two fair ratings primarily on

4

the basis of Gallo's conduct that led to her meeting with White and eventually her resignation in September 2010, and the parties agree that the ratings represent his honest, good-faith responses to the questions posed on the credential form. Dkt. 75, ¶¶ 93-95.

Mount Sinai contacted White to inquire further about Gallo. White spoke with the director of credentialing at Mount Sinai and to Lebwohl and told them both that Gallo was a good physician and that he did not want to hurt Gallo's employment prospects. Dkt. 75, ¶¶ 97-105. Gallo's credentialing file was not sent to Lebwohl's review, which was a preliminary step toward approval, and the credentialing committee did not make any recommendation or decision concerning Gallo's credentials. Dkt. 75, ¶¶ 113-116. Refuah did not formally rescind its last offer to Gallo. Dkt. 55, ¶ 24. Instead, Refuah filled its staffing needs with dermatologist employed by Mount Sinai who was already placed at Refuah and treating patients there.

### C. Procedural history

Gallo filed her complaint in May 2015, asserting tortious interference and breach of contract claims. Gallo later withdrew her tortious interference claim. In August 2016, defendants moved for summary judgment, Dkt. 39, and Gallo moved to strike the declaration of Manini, Dkt. 56. While these two motions were pending, the parties mediated and reached a settlement in principle. Dkt. 61. But Gallo refused to sign the written settlement agreement, reporting to the court that she had been forced into the settlement. Defendants filed a motion to enforce the settlement agreement. Dkt. 65. The two law firms who had been representing Gallo moved to withdraw, Dkt. 69, and I granted that motion, Dkt. 70. Gallo soon retained a third law firm to represent her, and she moved to stay proceedings and asked for a status conference. Dkt. 88. I denied that motion, but I gave Gallo additional time to

make the one filing that she had outstanding, her reply in support of her motion to strike the Manini declaration. Dkt. 92. All three motions are now fully briefed.

ANALYSIS

**A. Defendants' motion to enforce settlement**

Defendants contend that the settlement agreement reached at the mediation is enforceable. They argue that "[a]n oral agreement to settle an employment claim is enforceable in federal court; such an agreement does not need to be reduced to writing to be binding." Dkt. 66, at 3. They would be correct if federal law governed Gallo's claims. But Gallo asserts state-law contract claims, not a federal employment claim, so Wisconsin law governs the enforceability of the settlement agreement.

"[W]hen federal law governs the substantive rights of the parties and provides the basis on which the parties were able to bring the matter into federal court . . . enforceability of the [settlement] agreement must be decided as a matter of federal law. *Wilson v. Wilson*, 46 F.3d 660, 667 (7th Cir. 1995). But that is not the case where the dispute arises under state law. *See id.* at 666; *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999) ("Local contract law governs the construction and enforcement of settlement agreements."). Here, all claims and defenses concern Wisconsin law. Thus, Wisconsin law, rather than federal law, governs the enforceability of the parties' settlement agreement.

Under Wisconsin law, settlement agreements of active litigation must be in writing, unless they are made in court and on the record. *See* Wis. Stat. § 807.05; *Taylor v. Gordon Flesch Co.*, 793 F.2d 858, 862 (7th Cir. 1986) (noting that Wis. Stat. § 807.05 requires settlement agreements to be in writing but applying federal law instead because the case arose

6

under Title VII). Thus, I am skeptical of Gallo's claim that she was forced into the settlement agreement, but Wis. Stat. § 807.05 applies, so I must deny defendants' motion to enforce the settlement agreement.

**B. Gallo's motion to strike**

Gallo moves to strike the declaration of Manini, which states that Refuah's decision not to hire Gallo was not because of any credentialing decision, but because she was being difficult during the negotiation of her contract. Dkt. 44-4 (Manini Declaration); Dkt. 56 (motion to strike).

Both sides knew early on that Manini was an important witness in this case. As a third-party witness, Manini had no stake in the case and was obviously not eager to be deposed. Counsel for defendants worked promptly and diligently to get her deposition. They did not succeed, but ultimately obtained the challenged declaration on July 13, 2016, which they reasonably promptly shared with counsel for Gallo, on August 3. Defendants used the declaration in their motion for summary judgment filed August 12. For her part, Gallo was not so prompt and diligent. But seeing the declaration, and the use to which defendants put it in their motion for summary judgment, Gallo decided that it would be a good idea to depose Manini after all. But even then, counsel for Gallo did not move quickly, issuing a subpoena for Manini's deposition only on September 10. Manini again proved a difficult target, and Gallo turned to the court for relief, asking for an extension of the deadline for her summary judgment response so she could depose Manini. At the time, based only on Gallo's motion, it appeared to the court that both sides were somewhat at fault. Judge Crocker (with my approval), issued an order that gave the parties until September 26 to depose Manini, or "the court will strike her declaration so as to return both sides to ground zero on her

7

testimony." Dkt. 51. Gallo now contends that because Manini was not deposed by September 26, exclusion of her declaration should be automatic.

But now that I see the fuller record, exclusion is not warranted. There was no sandbagging by defendants' counsel: they kept Gallo's counsel informed of their efforts to get Manini's deposition, and they disclosed the declaration itself before they filed it. But Gallo's counsel did not even issue the subpoena to Manini until September 10, just two days before the original September 12 deadline to respond to defendants' motion for summary judgment. On September 27, Gallo's counsel learned that Manini was out of the country and unavailable until October 17, but he made no further attempt to seek relief from the court. It is only partially Gallo's fault that she did not get to depose Manini, but it was not defendants' fault at all. The motion to strike the Manini declaration is denied.

Manini states that the credentialing process did not cause Refuah's decision not to hire Gallo. Gallo has no admissible evidence to dispute this fact. And even if I were to strike Manini's declaration, Gallo still would have no admissible evidence to show that the fair ratings on the credential form caused her to lose the job at Refuah. For reasons explained more fully below, Gallo could not withstand summary judgment even if I strike the Manini declaration.

**C.  Defendants' motion for summary judgment**

Defendants move for summary judgment on all of Gallo's claims. Gallo expressly abandons her tortious interference claims in her summary judgment opposition brief, Dkt. 60, at 10, so I will dismiss them.

As for her contract claims, Gallo's complaint alleged four breaches of the Separation Agreement:

1. When it received a request for information from the credentialing committee at Mt. Sinai related to Dr. Gallo, Mayo Clinic did not send out the form letter of reference that was required under Section 1 B of the Agreement, and instead provided information in form and content that was contrary to the terms of the Agreement.

2. When it received a request for information from the credentialing committee at Mt. Sinai related to Dr. Gallo, Mayo Clinic did not have the request forwarded to and responded to by Barbara Saathoff, but instead allowed Dr. White to respond in writing.

3. When it received a request for information from the credentialing committee at Mt. Sinai related to Dr. Gallo, Dr. White, on behalf of Mayo Clinic, provided in writing disparaging information by using a "code word" (i.e. "fair") to describe Dr. Gallo's performance, which is commonly understood to convey a negative assessment of a physician's abilities and performance.

4. Dr. White talked with Dr. Lebwohl at Mt. Sinai and during the course of that conversation, on information and belief, Dr. White made negative and disparaging remarks about Dr. Gallo and her professional competence.

Dkt. 1, ¶ 31. Defendants address each of these in their opening summary judgment brief. In her opposition brief, Gallo raises no argument as to the third and fourth breaches, so the assertion of these two breaches will be deemed waived. *See Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 609 (7th Cir. 2008).

Gallo attempts to allege yet another breach in her opposition brief: that Mayo Clinic failed to expunge all references to Gallo's disciplinary matters. This assertion is untimely, and I could grant summary judgment on it for that reason alone. But, for reasons explained below, this new theory would fail on the merits as well.

The standards applicable to defendants' motion are well known. A court must grant summary judgment when no genuine issue of a material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477

9

U.S. 317, 322-23 (1986). Although the court must view the evidence in a light most favorable to the nonmoving party, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Asserted facts must be supported by evidence that would be admissible, and a genuine issue of a material fact "arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008). Inferences that rely on speculation or conjecture are insufficient to survive summary judgment. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).

To prevail on her breach of contract claim under Wisconsin law, Gallo must establish three elements: the existence of a contract; a breach of the contract; and damages from the breach. *See Brew City Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App 39, ¶ 11, 289 Wis. 2d 795, 714 N.W.2d 582; *Matthews v. Wisconsin Energy Corp. Inc.*, 534 F.3d 547, 553 (7th Cir. 2008). No one disputes that the Separation Agreement was a valid contract between the parties. The issues here are whether defendants breached the contract, and if they did, whether the breach caused damage to Gallo. The starting point on these issues is the text of the contract. *Riegleman v. Krieg*, 2004 WI App 85, ¶ 20, 271 Wis. 2d 798, 808, 679 N.W.2d 857, 863. If the text is ambiguous, the court may look at other factors to determine the intent of the parties. *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶ 36, 363 Wis. 2d 699, 713, 866 N.W.2d 679, 685. In this case, the text of the agreement is decisive.

1. **White's completing and returning the credential form did not breach the Separation Agreement**

Gallo contends that defendants breached the Separation Agreement when White completed and returned the Mount Sinai credential form with fair ratings in two areas. According to Gallo, this violated the requirements in the Separation Agreement that Mayo Clinic send only the specified form reference letter, that Mayo Clinic convey no information inconsistent with the reference letter, and that no derogatory statement be stated. Dkt. 60, at 3-4.

The fundamental flaw in Gallo's position is that Section 1.B. of the Separation Agreement addresses requests for references from prospective employers. But Mount Sinai was not a prospective employer; Refuah was. Gallo concedes that obtaining credentials is a prerequisite to gaining privileges at a hospital, and that one does not need to be an employee of a hospital to be granted privileges to practice there. Dkt. 75, ¶ 84. Credentials and employment are two separate matters. And there is no dispute that, at the time, no one at Mayo Clinic, including White, knew that the credential inquiry from Mount Sinai was related to a job offer from Refuah, or that Gallo had any job offer from anyone. *See* Dkt. 75, ¶¶ 126-29. The Separation Agreement does not specify what Mayo Clinic was to do with credentialing requests. Thus, completing and returning the credential form was not a breach of the express terms of the Separation Agreement.

Nor did it violate the spirit of the agreement. Defendants' response to the credentialing inquiry from Mount Sinai was a reasonable one that was consistent with their obligations under the Separation Agreement. Sending only the form reference letter, or declining to respond at all, certainly would not have helped Gallo secure credentials from

11

Mount Sinai. Having Saathoff give the standard protocol response limited to dates of employment and position would not have helped either. As Gallo acknowledges, Mount Sinai sought *peer* review for its credentialing process. Dkt. 76, ¶ 89. White is a doctor and Saathoff is a lawyer. Thus, from Mayo Clinic, White could provide peer review, but Saathoff could not. Before White responded to the credentialing request from Mount Sinai, he consulted with Saathoff about how to respond to it in light of Mayo Clinic's obligations under the Separation Agreement. What they decided was reasonable, and it was not calculated to interfere with Gallo's employment prospects or her obtaining credentials at Mount Sinai.

### 2. The content of the credential form did not breach the Separation Agreement

The Separation Agreement prohibits Mayo Clinic from making certain unfavorable comments about Gallow. The pertinent portion of Section I.B. of the Separation Agreement provides:

> In the event Employer receives any requests for a verbal reference for Employee, all such requests shall be directed to Barbara Saathoff, who will respond to the inquiry pursuant to normal procedural protocol relevant to Employee's dates of employment and position. Employer will state nothing that will be inconsistent with the letter of reference (Exhibit A) attached hereto. No reference will be made to any performance issue and nothing derogatory will be stated.

Dkt. 1-1, at 2. The prohibition on making statements inconsistent with the form letter of reference is a restriction that applies only to verbal references.[1] But even if it were interpreted

---

[1] In some contexts, the term "verbal" can refer to either an oral or a written communication, as long as the communication relates to words. But in the context of the Separation Agreement, "verbal" is used in the sense of "oral," which is an alternative definition of the word. See VERBAL, Bryan Garner, Black's Law Dictionary (10th ed. 2014) ("1. Of, relating to, or expressed in words. 2. Loosely, of, relating to, or expressed in spoken words."). Other sections of the Separation Agreement use "verbal" in this sense. *See* Dkt. 1-1, at 6-7 ("Employee Has Not Relied on any Verbal Representations. . . . As a further inducement to the parties to enter into this Separation Agreement and General Release, both parties agree

more broadly, I cannot determine whether the credential form is inconsistent with the form reference letter, because neither side has put the form letter into the record. Although defendants are the moving parties here, this is an issue on which Gallo bears the burden of proof. Gallo has not introduced the letter or even pointed out how the credential form is inconsistent with it. Thus, summary judgment is appropriate on this issue. *See Spierer v. Rossman*, 798 F.3d 502, 507-08 (7th Cir. 2015).

The prohibition against referring to any performance issue or making any derogatory statement is another restriction that applies only to verbal references. The pertinent text speaks in the passive voice ("No reference will be made"), so it makes sense to read it in the context of what comes before: how Mayo Clinic must respond to requests for verbal references. Gallo contends that the credential form was a reference request, Dkt. 60, at 6, but she does not argue that the text of the Separation Agreement imposes a broader blanket prohibition on making any negative statement, whether verbal or written.

In sum, the defendants did not breach the Separation Agreement by having White complete the credential form in good faith and return it to Mount Sinai. And even if Gallo could show that these actions breached the Separation Agreement, she has not adduced evidence to show that the fair ratings on the credential form caused her damage, for reasons discussed in the next section.

---

not to make any verbal or written slanderous, derogatory or disparaging remarks against or about the other or any of its employees or affiliates."). Gallo does not contest the point.

### 3. Gallo cannot show damages from the failure to expunge "all references to any disciplinary or performance concern"

Gallo also contends that Mayo Clinic breached the requirement that it expunge all references to her performance problems or disciplinary action. The pertinent provision of the Separation Agreement provides:

> Employer agrees that it will expunge all references to any disciplinary or performance concern relevant to Employee.

Dkt. 1-1, at 2. It appears that Mayo Clinic failed to destroy all the records concerning Gallo's performance problems and discipline because some of those documents turned up in discovery. Nevertheless, Gallo cannot sustain a breach of contract claim on this issue for several reasons.

As indicated above, Gallo presents this alleged breach for the first time in her brief in opposition to defendants' motion for summary judgment, without amending her complaint to add allegations that would support this new theory. A complaint need not identify a plaintiff's legal theories, but it must "allege some facts that support whatever theory the plaintiff asserts." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013) (citation omitted); *accord Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir.2002)). The court will not allow Gallo to sandbag defendants by adding a new allegation in her summary judgment opposition, which deprives defendants of a full opportunity to challenge the allegation with discovery and a motion for summary judgment.

But in any case, the allegation also fails on the merits, because Gallo cannot establish that she was damaged by the failure to expunge the records. Gallo's theory requires her to

14

establish a causal chain comprising at least three facts: (1) White used an unexpunged document to give the two "fair" ratings on the credential form; (2) White's two "fair" ratings prevented Gallo from obtaining the necessary credentials at Mount Sinai; and (3) Gallo's lack of credentials at Mount Sinai caused Refuah to not hire Gallo. But she does not adduce evidence sufficient to raise a genuine issue as to these facts.

Gallo contends that White's deposition testimony shows that he relied on an unexpunged document to rate Gallo "fair" on the credential form. But the portion of White's deposition cited by Gallo shows only that White relied on the underlying facts of her performance problems and discipline, not the unexpunged document itself. Dkt. 52 (White Dep. 26:8-28:11). White testified unequivocally that he remembered the situation and that he did not at the time have access to the document. There is no serious question that White could complete the credential form from memory, and thus Gallo cannot show that failure to expunge the documents led to White's fair ratings that she alleges caused the damage.

Gallo also cannot show that it was the two fair ratings that prevented Gallo from getting the credentials from Mount Sinai. For this point, Gallo relies predominately on her own declaration in which she reports statements by Lebwohl about her credentialing evaluation at Mount Sinai, which in turn include statements that others told Lebwohl. Dkt. 76, ¶¶ 38-46. Gallo's reports of Lebwohl's statements are prototypical examples of inadmissible hearsay insufficient to raise a genuine dispute of fact. *See* Fed. R. Evid. 801; *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 883 (7th Cir. 2016). Gallo adduces the admissible testimony of Stephen Flaim, Mount Sinai's Senior Director of Medical Credentialing, that any fair rating would prompt further inquiry with the peer reviewer. Dkt. 76, ¶¶ 84-97. But Flaim also testified that a fair rating was not necessarily disqualifying

and that Mount Sinai had no written policy regarding the interpretation of fair ratings or consequences of fair ratings on its credential forms. Dkt. 75, ¶¶ 112, 132, 137 and Dkt. 76, ¶ 90. White's fair ratings did indeed prompt further communication between White and Mount Sinai. But Mount Sinai never reached a decision on Gallo's credentials. Dkt. 75, ¶¶ 114-16. Gallo contends in her brief—without citing evidence—that she was "forced" to withdraw from the process before Mount Sinai made its decision because Mount Sinai began questioning her about the two "fair" ratings.[2] Dkt. 60, at 7. This is consistent with Flaim's testimony that fair ratings would prompt inquiry, but Flaim's testimony falls short of establishing that Gallo was "forced" to withdraw from the process or that defendants caused her to withdraw. Thus, Gallo has adduced no admissible evidence that White's fair ratings prevented her from being credentialed at Mount Sinai.

Finally, as to the third fact in the causal chain, defendants have adduced ample evidence that Refuah had other reasons for declining to hire Gallo, specifically that Refuah had other personnel available and that Gallo had been difficult to deal with. Manini denies that the lack of Mount Sinai credentials caused Refuah's decision not to hire Gallo. Gallo can show, at most, that the Mount Sinai credentials could have been a factor for Refuah. But Gallo has no affirmative evidence that her credentials mattered in this case.

In sum, Gallo can show that Mayo Clinic did not expunge all records of Gallo's performance issues and discipline, as required under the Separation Agreement. But Gallo has not adduced evidence that White used those records in completing the Mount Sinai credential form or that the fair ratings on that form caused Mount Sinai to deny her

---

[2] Gallo's statement that she withdrew actually contradicts her proposed findings of fact, in which she contends that she continued to try to get credentials. Dkt. 76, ¶¶ 51-54, 64, 65.

credentials. Gallo also fails to adduce admissible evidence that the credentialing process caused Refuah's decision not to hire Gallo. Without evidence to support these facts, Gallo cannot show that Mayo Clinic's breach caused her damage. Her breach of contract claim fails, and defendants are entitled judgment as a matter of law.

ORDER

IT IS ORDERED that:

1. Defendants Mayo Clinic Health System – Franciscan Medical Center, Inc. and Michael White's motion to enforce settlement, Dkt. 65, is DENIED.

2. Plaintiff Elisa S. Gallo's motion to strike the declaration of Corinna Manini, Dkt. 56, is DENIED.

3. Defendants' motion for summary judgment, Dkt. 39, is GRANTED.

4. Defendants' motion for leave to file sur-reply, Dkt. 96, is DENIED.

5. This case is DISMISSED.

6. The clerk of court is directed to enter judgment in favor of defendants and close the case.

Entered January 24, 2017.

BY THE COURT:
/s/
_____
JAMES D. PETERSON
District Judge